Stephanie GROTELUESCHEN, by her Guardian ad Litem, Joseph G. Doherty, Keith T. Grotelueschen and Roxanne Grotelueschen, Plaintiffs-Respondents,†

v.

AMERICAN FAMILY MUTUAL INSURANCE COMPANY, Defendant-Appellant,

Ronald E. DIMMER, Saukville Plumbing, Inc., and General Casualty Company of Wisconsin, Defendants,

CERA-MITE CORPORATION, Defendant-Respondent.†

Court of Appeals

*No. 90-2571. Submitted on briefs March 15, 1991.—Decided June 5, 1991.*

(Also reported in 472 N.W.2d 544.)

†Petition to review granted.

On behalf of the defendant-appellant the cause was submitted on the brief of *Phillip E. Crump* of *Borgelt, Powell, Peterson & Frauen, S.C.* of Milwaukee.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Gregg E. Bridge,* of *Petrie & Stocking, S.C.* of Milwaukee.

On behalf of the plaintiffs-respondents the cause was submitted on the brief of *Joseph G. Doherty* and *Patrick R. Griffin* of *Bunk, Doherty & Griffin, S.C.* of West Bend.

Before Nettesheim, P.J., Brown and Anderson, JJ.

NETTESHEIM, P.J.   This is an insurance policy coverage case. American Family Mutual Insurance (American Family) appeals from a judgment directing it to pay $570,000 to the Grotelueschens[1] as damages resulting from a tractor lawn mower accident in which Stephanie Grotelueschen was injured by the actions of Ronald Dimmer, the insured. At summary judgment, the trial court ruled that Dimmer's actions were covered by a "Businessowners [sic] Package Policy" issued by American Family to Dimmer's partnership.

The Grotelueschens contend that coverage exists on two bases: (1) under the policy's "Comprehensive General Liability" provision; and (2) because Dimmer was engaged in partnership conduct covered by the policy.

---

[1]Cera-Mite Corporation is also a respondent on appeal. We refer to all respondents collectively as "the Grotelueschens."

We disagree with both arguments. Accordingly, we reverse the judgment of the trial court.

The essential facts at the time of the accident are not in dispute. Ronald and Louise Dimmer owned and operated a partnership known as "D&R Rentals." The partnership owned an eight-unit apartment building located at 417 Dries Street in Saukville, Wisconsin. Mr. Dimmer was also part owner and operator of Saukville Plumbing, Inc.

The partnership insured the apartment building under a "Businessowners [sic] Package Policy" issued by American Family. The policy listed the insured as "Dimmer, Ronald E & Louise J Dimmer" and identified them as a "partnership." The policy recited the business premises site as 417 Dries Street, Saukville, the address of the apartment building.

The Dimmers also jointly owned two other properties in Saukville—their private residence on South Main Street and a lot on North Mill Street. The lot was vacant save for a storage shed which the Dimmers dubbed the "red shed." The Dimmers purchased the red shed some years before the apartment building. The three properties—the apartment building, the private residence, and the "red shed" lot—are near, but not contiguous to, each other.

Dimmer personally performed the maintenance and grounds keeping for all three properties. He used the red shed as storage for numerous items. Some items were the Dimmers' personal equipment and materials used in all of their activities. Other items were related solely to Saukville Plumbing. Still other items were related solely to the apartment building. Most items associated with the upkeep of the apartment building were kept in the red shed, for the apartment building had only a small—four feet by five feet—storage area.

670

The Dimmers paid all expenses associated with the red shed and the red shed lot, including property taxes, insurance, and repairs, with their personal funds. The red shed was included in the coverage provided under a homeowner's policy issued to the Dimmers by General Casualty Insurance Company of Wisconsin.

The Dimmers purchased the lawn tractor involved in the accident with their personal funds.[2] Neither the partnership nor Saukville Plumbing depreciated the tractor for tax purposes.

In the spring and summer, Dimmer used the lawn tractor to cut the grass at his residence, the apartment building and the Saukville Plumbing premises. Rather than transporting the tractor on a trailer, Dimmer simply drove the tractor to and from the three properties. When the tractor was not in use, Dimmer kept it at either his residence or the red shed. During the winter months, Dimmer kept the tractor in Saukville Plumbing's heated shop. The tractor's off-season attachments—the snowthrower in the summer, the mower in the winter—were stored in the red shed.

On May 20, 1983, the day of the accident, the tractor mower was stored at the Dimmers' residence. When Dimmer returned home after work, he decided to mow the lawn at the apartment building. He hitched a small, two-wheeled trailer to the tractor, placed his four-year-old granddaughter Stephanie on his lap, and drove to the apartment building, some three blocks away. Upon arrival at the apartment building, Dimmer unhitched the trailer from the tractor and placed Stephanie in the trailer. While Dimmer mowed the lawn, Stephanie sat

---

[2]The Dimmers maintained a separate checking account under the name "D&R Rentals." They used this account to handle all income and expenses associated with the apartment building.

and watched from the trailer. When Dimmer finished mowing, he and Stephanie raked up the clippings. Dimmer then reattached the trailer and drove with Stephanie to the red shed lot, a distance of approximately three and one-half blocks. Stephanie rode in the trailer.

The red shed lot is surrounded by a fence. The shed itself is situated on the edge of the lot line which runs along North Mill Street. The only entrance to the shed itself is directly off North Mill Street, through an overhead garage door. However, the red shed *lot* may be entered through a gate in a section of the fence which runs the length of another lot line. This gate is accessible from a gravel service drive on the other side of the fence, which forms the boundary of the adjoining property: a small park. A grassy strip, approximately nine or ten feet in width, lies between the edge of the gravel drive and the fence surrounding the red shed lot.

Dimmer approached the red shed lot from the gravel drive in the park, as was his usual practice. He stopped outside the gate, unhooked the trailer, and left the trailer—with Stephanie still seated inside—on the grassy strip between the gravel drive and the fence surrounding the lot. Dimmer opened the gate, drove the tractor mower through, and commenced mowing the red shed lot. Shortly thereafter, Dimmer backed the tractor mower up to avoid a large vine growing near the fence. As he backed up, Dimmer accidentally ran over Stephanie, who, unbeknownst to him, had climbed out of the trailer and wandered through the gate and into the red shed lot. Stephanie sustained severe, permanent injuries as a result.

Stephanie and her parents commenced this action against: (1) Dimmer; (2) his homeowner's insurer, General Casualty; (3) the partnership insurer, American Family; and (4) Saukville Plumbing and its liability

insurer, General Casualty. The Grotelueschens also sued Cera-Mite Corporation as a subrogated payor of health insurance benefits.

American Family brought a motion for summary judgment, claiming that Dimmer was not acting on behalf of the partnership and thus was not an insured person within the meaning of its policy.[3] Saukville Plumbing and its insurer, General Casualty, also brought a motion for summary judgment, contending that Dimmer was not acting within the scope of his employment with Saukville Plumbing at the time of the accident. The Grotelueschens countered with their own motion for partial summary judgment on the questions of coverage under the American Family and General Casualty policies.

Following a hearing on these motions, the trial court issued a written decision declaring that Dimmer was not acting within the scope of his employment with Saukville Plumbing at the time of the accident. Thus, the court dismissed the Grotelueschens' complaint against Saukville Plumbing and its insurer, General Casualty. As to American Family, however, the court ruled that Dimmer's actions were covered under the policy's "Comprehensive General Liability" provisions and, alternatively, that Dimmer was acting on behalf of the partnership at the time of the accident. Therefore, the court granted the Grotelueschens' motion for partial summary judgment on the coverage issues.

Following this ruling, the parties stipulated to the Grotelueschens' damages. Based on this stipulation, the trial court entered judgment against American Family in the amount of $570,000, together with interest from the

---

[3]American Family also claimed that the red shed lot was not the property insured under the policy.

date of entry of judgment.[4] This stipulation preserved American Family's right to take this appeal.

Two issues are presented for review: (1) whether the accident is covered under the "Comprehensive General Liability Insurance" provisions of the partnership's "Businessowners [sic] Package Policy"; and (2) whether Dimmer was engaged in partnership business activity covered under the policy.

Construction of an insurance policy presents a question of law. *Hoeft v. United States Fire Ins. Co.,* 153 Wis. 2d 135, 140, 450 N.W.2d 459, 461 (Ct. App. 1989). We owe no deference to the trial court's interpretation of an insurance policy. *Keane v. Auto-Owners Ins. Co.,* 159 Wis. 2d 539, 547, 464 N.W.2d 830, 833 (1991).

The interpretation of an insurance contract is controlled by the principles of construction applied to contracts in general. *Lambert v. Wrensch,* 135 Wis. 2d 105, 115, 399 N.W.2d 369, 373 (1987). The goal of construction is to ascertain the true intentions of the parties to the insurance contract. *Wood v. American Family Mut. Ins. Co.,* 148 Wis. 2d 639, 652, 436 N.W.2d 594, 599

---

[4]According to the terms of the stipulation and order, the parties agreed that the Grotelueschens' total damages are $670,000. Prior to the entry of judgment, General Casualty paid its policy limits—$100,000—under its homeowner's policy in exchange for a full release from the Grotelueschens and Cera-Mite Corporation. This payment and the corresponding releases are not contingent on the outcome of this appeal.

Also prior to the entry of judgment, Ronald Dimmer was dismissed from the action without costs, and without prejudice.

Pursuant to the stipulation and order, no party may execute on the judgment while this appeal pends.

(1989). And, in the case of an insurance contract, the words are to be construed in accordance with the principle that the test is not what the insurer intended the words to mean but what a reasonable person in the position of an insured would have understood the words to mean. *Id.* When the terms of a policy are plain and unambiguous, we will construe it as it stands. *Ford Motor Co. v. Lyons,* 137 Wis. 2d 397, 460, 405 N.W.2d 354, 379 (Ct. App. 1987).

We conclude that the American Family policy language is clear and unambiguous: the accident was not the sort of event envisioned under the comprehensive provisions of the policy. In addition, we conclude that Dimmer's actions were not partnership activities relating to the apartment building within the meaning of the policy.

## COMPREHENSIVE GENERAL LIABILITY INSURANCE PROVISIONS

The American Family policy is titled "Businessowners [sic] Package Policy," and provides insurance for "loss to property, business liability and other described coverages." The policy consists of two coverage sections. "Section I" applies to damage to tangible business property described in the declarations, and thus is not germane to this appeal.

We concern ourselves with "Section II" of the policy, titled "Business Liability And Medical Expense Insurance." Section II, coverage A, titled "Comprehensive General Liability Insurance," contains an insuring agreement which states:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage or personal injury *to which this insur-*

675

*ance applies,* caused by an occurrence . . .. [Emphasis added.]

This section of the policy defines "Persons Insured" as including:

Each of the following is an insured under this insurance to the extent set forth below:

. . ..

2. *if the named insured is designated in the declarations as a partnership* or joint venture, the partnership or joint venture so designated and *any partner,* member or employee thereof *but only with respect to his liability as such;* [Emphasis added.]

The Grotelueschens contend that the above concluding phrase—"but only with respect to his liability as such"—applies *only* to the immediately preceding entity—employees—not to the other entities recited in the "Persons Insured" clause. The trial court agreed, concluding that the language describing an insured partner is not restricted in any fashion—particularly as to activities or locations.[5] The court stated: "The partnership coverage is not limited by the limitation which applies to employees, that is, 'but only with respect to his liability as such . . ..' [And,] [s]ince Mr. Dimmer was a partner the policy covers him for any acts for which he might become liable. The policy language does not limit this coverage."

---

[5]Cera-Mite takes a similar stance. By negative inference, Cera-Mite contends the accident was covered because none of the "seventeen exclusions references an exclusion for liability for bodily injury or personal injury occurring off of the insured premises, nor is a limitation stated that the personal injury coverage afforded only extends to any injury caused as a direct result of a business purpose."

American Family complains that the trial court's construction transforms this businessowners' policy into a comprehensive personal liability coverage for "every negligent act of Mr. or Mrs. Dimmer, whatever it was or wherever it occurred." We agree that this is the effect of the trial court's reading of the policy. We conclude that this reading does not reflect the intention of the parties, viewed from the standpoint of how a reasonable insured would understand the policy. *Wood,* 148 Wis. 2d at 652, 436 N.W.2d at 599.

█

We look first to the policy generally. The policy is entitled "Businessowners [sic] Package Policy." The policy was issued to a partnership engaged in the business of residential rentals. The policy recites the apartment address as the business locale. We conclude that a reasonable insured would take these recitals, absent other provisions, as insuring his or her business-related activities.

We now move to the policy's specific liability provisions. This section is entitled "*Business Liability* And Medical Expense Insurance." (Emphasis added.) The "Insuring Agreement" paragraph obligates American Family to pay damages for events "to which this insurance applies . . .." Again, this language speaks of business-related liability. We see nothing in this language which suggests to a reasonable insured that the policy confers comprehensive personal liability protection.

█

Against this context, the trial court nonetheless chose to apply the qualifying clause—"but only with respect to his liability as such"—only to employees and not to a partner. This, we conclude, does violence to the intentions of the parties to this insurance agreement. We must read an insurance policy in its entirety. *Reznichek*

*v. Grall,* 150 Wis. 2d 752, 757, 442 N.W.2d 545, 548 (Ct. App. 1989). We cannot conclude that a reasonable insured in Dimmer's position would understand the words of this policy to accord him and his wife the all-encompassing personal liability coverage for which he now contends. *See Wood,* 148 Wis. 2d at 652, 436 N.W.2d at 599.

In addition, the trial court's interpretation reads the word "or" out of the phrase "partner . . . *or* employee": The qualifying language at issue refers back to whichever term is appropriate—"partner" or "employee"—depending on whether a partner or an employee committed the negligent act. This language indicates that "partner" and "employee" are meant to be interchangeable terms depending upon the particular circumstances of each claim. Viewing the policy's language in its totality, the aim of the parties is clear—to provide liability coverage to a partner or partnership employee who acted on behalf of the partnership. This was the coverage the Dimmers, as a partnership, sought; this was the coverage American Family provided.

We cannot, thus, agree with the Grotelueschens that American Family's position represents a "tortured" construction of the policy. Looking to all the relevant portions of the policy, the meaning of the "Persons Insured" provision is clear in its message to a reasonable insured—coverage is limited to the business activities of the insured partnership.[6]

---

[6]We also cannot agree with Cera-Mite that the policy contains no coverage limitation for non-business activities because none of the exclusions speaks to such a limitation. Since the policy itself clearly and unambiguously contains a business activity limitation, the exclusions are understandably silent on the subject.

## ACTIVITY

We turn next to the question of whether Dimmer was engaged in a partnership-related activity covered under the policy. The trial court ruled that Dimmer was acting on behalf of D&R Rentals, the insured partnership, at the time of the accident. In particular, the trial court placed great reliance on the multiple uses to which the red shed and the lawn tractor were put. The trial court stated:

> [T]he red shed was used for storage of items that were used for maintenance at the eight unit . . .. The lawn tractor involved in this accident was used to cut the grass at the eight unit as well as at other properties in which the Dimmers had an interest. The tractor was stored at the red shed on occasion as were the off season attachments . . .. On the day in question Dimmer had mowed the lawn at the eight unit with the tractor before coming to the red shed and starting to mow that lawn . . .. Wisconsin law is clear that a partnership is liable for the wrongful acts of partners . . .. [H]e was doing an act with respect to the conduct of the business. There is no rule that says that the act must be exclusively for the business . . .. The fact that there were multiple purposes does not mean that the partnership purpose is excluded . . .. The entire red shed property had to be maintained properly both under the ordinances of the Village and in the ordinary course to keep up the property.

In essence then, the trial court determined that the American Family policy accorded coverage because: (1) Dimmer stored partnership items, and sometimes the tractor, at the red shed; (2) Dimmer's actions in maintaining the red shed lot necessarily became acts in service of the partnership; and (3) Dimmer had just concluded mowing the lawn at the apartment building. In

679

addition, the Grotelueschens contend that coverage exists because the red shed lot is partnership property under the safe-place statute. We address each of these considerations in turn.

Storage

The trial court ruled that coverage existed, *inter alia,* because Dimmer used the red shed for storage of certain partnership items, including the occasional storage of the lawn tractor. The problem with this logic is that it triggers coverage no matter how tenuous a relationship between the storage and the partnership.

Dimmer was not using partnership property *always* stored in the red shed. He was using a lawn tractor *sometimes* stored in the red shed. In fact, on the day of the accident, the tractor was stored at the Dimmer residence—not the red shed. Moreover, the lawn tractor was not partnership property; it was not carried as an asset on the books of the partnership; and it was not depreciated for tax purposes by the partnership. To the contrary, the tractor was purchased by the Dimmers with their own personal funds.

In effect, the trial court ruled that the *occasional* storage of a personal item *sometimes* used in partnership activity in a building where *other* items always used for partnership activity are stored triggers coverage under this policy. This, we conclude, represents an unreasonable and absurd interpretation of this insurance policy, far beyond what a reasonable insured would understand the policy to cover. We are instructed to avoid such a result. *Olguin v. Allstate Ins. Co.,* 71 Wis. 2d 160, 165, 237 N.W.2d 694, 697 (1976).

## Maintenance of the "Red Shed" Lot

We hold the same reservations regarding the trial court's reasoning that because partnership items were stored in the red shed, the red shed lot had to be properly maintained and, therefore, Dimmer's mowing of the red shed *lot* was partnership related.

The question here is not whether some "linkage" (no matter how tenuous) can be made between the partnership and the red shed lot. It can. This, however, begs the coverage question before us. That question is not whether some "linkage" exists, but rather whether the policy covers such attenuated activity. Again, we measure this inquiry by what a reasonable insured would understand the policy to cover. *See Wood,* 148 Wis. 2d at 652, 436 N.W.2d at 599.

If coverage is provided in this instance, then coverage must also exist if Dimmer had negligently injured Stephanie while maintaining his own residence or that of Saukville Plumbing, since Dimmer also stored the lawn tractor at these sites. Such a result, we conclude, is, or borders on, the unreasonable or absurd. A reasonable insured would not understand this policy to accord coverage in such situations. The instant case is no different.

Moreover, the trial court's conclusion that Dimmer was acting on behalf of the partnership is inconsistent with the court's further ruling that Dimmer was *not* acting on behalf of Saukville Plumbing. Dimmer, the part-owner and operator of this corporation, also stored certain of the corporation's personal property in the red shed. If, as the court reasoned, the red shed had to be maintained for partnership purposes, it follows that the red shed also had to be maintained for the corporation's purposes. Yet, the court did not see sufficient linkage

between Dimmer's role as an agent of the corporation and his activities on the day in question to bring his activities under the corporate ambit. But, under the same analysis and similar facts, the court reached a different result as to the partnership. We conclude the court was correct as to the corporation, but incorrect as to the partnership.

## The Apartment Mowing

In support of its conclusion, the trial court also noted that Dimmer had just concluded mowing the apartment property shortly before the accident on the red shed lot. We do not deem this happenstance as relevant or controlling on this coverage question. We conclude that the Grotelueschens cannot "bootstrap" coverage from Dimmer's chosen order of events on the day in question. It does not follow that where an insured engages in several actions, even those undertaken in close sequence, that the insured had the same purpose for engaging in each separate act.

## Safe-Place Statute

Although the trial court did not utilize this rationale, the Grotelueschens contend that because the Dimmers stored partnership materials at the red shed, and because Wisconsin partnership law, in conjunction with safe-place statutes, dictates that the Dimmers must maintain the red shed property, Dimmer was acting in his role as a partner in D&R Rentals when he mowed the red shed lot.

Again, this sort of logic is, essentially, bootstrapping from matters extrinsic to the policy. The Grotelues-

chens' argument assumes that storage of items associated with the apartment house transforms the red shed, *de facto,* into partnership property subject to safe-place requirements. We are not prepared to take this leap in legal logic. Even if we did, such would not control the *insurance coverage* question before us. The safe-place statute is a standard of care statute—not an insurance coverage statute. As we have repeatedly noted herein, insurance policy coverage questions are governed by the words of the policy and the intent of the parties.

Moreover, Stephanie was not injured by any condition intrinsic to the premises itself. Her claim is that Dimmer injured her by the negligent operation of the lawn tractor. Safe-place considerations do not govern the issue in this case.

## CONCLUSION

While Dimmer is entitled to an interpretation of American Family's policy from the standpoint of what a reasonable insured would understand the policy to cover, *Wood,* 148 Wis. 2d at 652, 436 N.W.2d at 599, we must also bear in mind that an insurance company is not bound to a risk which it did not contemplate and for which it received no premium. *Reznichek,* 150 Wis. 2d at 758, 442 N.W.2d at 548. Under the language of this policy, Dimmer could not reasonably expect coverage for the accident and American Family did not insure the risk of this accident.

Accordingly, we reverse the judgment.

*By the Court.*—Judgment reversed.

BROWN, J. *(dissenting).* I dissent because I disagree with the majority on the issue of whether Ronald Dimmer was engaged in a partnership-related activity at

the time of the accident. The majority focuses on the lawn tractor and correctly concludes that the lawn tractor is not sufficiently connected to the partnership to make mowing a lawn with the tractor a partnership-related activity. Nor does the proximity in time between mowing the apartment lawn and mowing the "red shed" lot make the latter a partnership-related activity. However, I conclude that the importance of place has been overlooked in the majority's analysis.

Since the property where this accident occurred was partnership related and the person causing the accident was maintaining that property, that person was performing a partnership-related activity. Moreover, that person was a partner who was insured for any liability related to the partnership. Thus, Dimmer's "Businessowners [sic] Package Policy" from American Family Mutual Insurance Company covers this accident.

The reason the property is partnership related is because there was not adequate storage space at the eight-unit apartment building and so equipment and supplies used to maintain the partnership property were stored in the red shed. It is irrelevant whether the lawn tractor was stored in the red shed. Moreover, Dimmer needed to have equipment and supplies to maintain his apartment property not simply to satisfy a personal desire to keep up the property, but because he was required by the safe-place statute, sec. 101.11(1), Stats., to maintain the eight-unit apartment building.

Since Dimmer's "red shed" lot was thus partnership related as the storage location for partnership maintenance equipment and supplies, Dimmer's maintenance of the "red shed" lot was also partnership related. When Dimmer was mowing the lawn on the day of the accident, he was maintaining the lot. Thus, the lawn mowing was partnership related. Therefore, the injury Dimmer

caused is covered under the liability policy issued to the partnership.

In reaching the conclusion that I do, I am mindful of our appellate standards of review in construing policies. Contracts are construed most strongly against those who write them. *Garriguenc v. Love,* 67 Wis. 2d 130, 135, 226 N.W.2d 414, 417 (1975). In this instance, it is American Family that wrote the policy. This principle is especially prevalent with respect to exclusions and conditions. *See Kaun v. Industrial Fire & Cas. Ins. Co.,* 148 Wis. 2d 662, 669, 436 N.W.2d 321, 324 (1989). We cannot give clear and unambiguous language a forced construction against the insurer; but neither should we ignore the maxim that where there is uncertainty with respect to coverage, the construction must favor the insured. *See Northwestern Nat'l Ins. Co. v. Nemetz,* 135 Wis. 2d 245, 254–55, 400 N.W.2d 33, 37 (Ct. App. 1986).

In the policy before us, the language providing coverage is very broad and indefinite. While I recognize that it is not possible for American Family to contemplate all the possible occurrences that might lead to bodily injury and write exclusions or conditions for these occurrences, we must still construe the necessarily vague provisions in their most inclusive sense for the benefit of the insured.

In this policy, there is no language whatsoever limiting liability to location or activities. Nor is there any language defining the scope of business-related activities. The main thrust of the majority opinion is found in its statement that the "linkage" between Dimmer's cutting the grass around the red shed and its being a business-related activity, incidental to keeping up an apartment a few blocks away, is so attenuated as to be absurd. Yet, the majority cannot point to any language in the policy that sets forth, as a prerequisite, that the injury actually occur on the premises described in the policy.

685

To be fair, the policy does not say that any activity incidental to the maintenance of the apartment, no matter how attenuated, is covered by the policy. But the point is, the policy does not address it at all. This leaves persons of ordinary intelligence guessing as to just what is covered. Given that scenario, I must construe the coverage most strongly against the insurer.

For the above reasons, I would affirm the judgment of the trial court.