# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2012-CA-00217-SCT

*ANNA M. ALFONSO, ET AL.*

*v.*

*DIAMONDHEAD FIRE PROTECTION DISTRICT,*
*JACK CLEVELAND, EDWARD DABLER,*
*PATRICK DESTEFANO, ELOISE KINJA, PAT*
*KINSELLA, RUSSELL LOVE, CHARLES*
*REDDIEN, PAUL SNEMYR, AND DICK WEBER*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/28/2011 |
| TRIAL JUDGE: | HON. ROGER T. CLARK |
| COURT FROM WHICH APPEALED: | HANCOCK COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | DAVID NEIL McCARTY |
| | OLIVER E. DIAZ, JR. |
| | WILLIAM M. KULICK |
| ATTORNEYS FOR APPELLEES: | MICHAEL B. DICKINSON |
| | EDWARD C. TAYLOR |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED - 08/01/2013 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**WALLER, CHIEF JUSTICE, FOR THE COURT:**

¶1. A group of property owners filed suit against the Diamondhead Fire Protection District (DFPD) board of commissioners and several current and former DFPD officers, seeking declaratory judgment that a fee charged for fire-protection services is an impermissible tax. Finding the DFPD had authority to charge fees for services rendered, the

trial court entered a judgment in favor of the DFPD. The property owners appeal, raising two issues: (1) whether the monthly fee is an illegal tax, and (2) whether the power to tax should be construed narrowly. We find that the trial court correctly decided that the DFPD provides a service to the community, and therefore, the challenged fees for such services are lawful. Therefore, we affirm the trial court's judgment.

## FACTS AND PROCEDURAL HISTORY

¶2. In 1974, the Hancock County Board of Supervisors adopted a resolution creating the DFPD. When it initially was formed, the DFPD was funded through ad valorem taxes and contributions from the Diamondhead Property Owners Association (POA). However, in 1993, the POA stopped contributing to the DFPD. Since 1993, the DFPD has charged local property owners a monthly fee for fire-protection services. From 1993 to 2002, the monthly charge for individuals was $15; however, in 2002, the price increased to $20 per month.

¶3. Since 1974, the DFPD has grown tremendously. The DFPD now has two fire departments and fifteen full-time employees. At all times, the DFPD has four experienced firefighters on duty, including a captain and lieutenant. Half of the staff members are nationally registered emergency medical technicians. With full-time employees, the DFPD is responsible for payroll taxes, workers' compensation, supplies, equipment, repairing and maintaining equipment, providing uniforms, training, oil and gas costs, administrative costs, and so on. According to Fire Chief Jerry Dubuisson, the DFPD responds to more than 700 calls for emergency assistance a year. The DFPD also conducts post-fire investigations, commercial fire and life safety inspections, pre-incident plans, fire-hydrant inspections, and public fire-and-life safety education training.

2

¶4.     On March 3, 2009, several property owners sued the DFPD and several current and former members of the DFPD board of commissioners (collectively referred to as the DFPD). While conceding the DFPD could charge fees for services rendered, the property owners argued that they were not receiving a service from the DFPD and, thus, the fee was an impermissible tax. The property owners alleged claims of negligence and extortion against the DFPD. The property owners also filed a motion for declaratory judgment, requesting the trial court to determine the meaning of "services rendered" under Mississippi Code Section 19-5-177(e) and declare whether the DFPD should be enjoined from collecting its fire-protection fee. The DFPD filed a response, urging that it had authority to charge the fee for services rendered. The DFPD also filed three affidavits to support its position from Fire Chief Jerry Dubuisson, Ty Windham of the Mississippi State Rating Bureau, and State Farm Agent Teri Eaton.

¶5.     Dubuisson stated that, without the fees, the DFPD would have to decrease staffing to two, full-time firefighters per shift and decrease salaries; it could not operate twenty-four hours a day; and it possibly would close one of the fire stations. Regardless of funding, Dubuisson opined that the DFPD would still respond to more than 700 emergency calls per year. Dubuisson stated that a reduced staff would result in response delay times, and reduced pay would result in a less experienced staff. Windham, superintendent of public protection with the Mississippi Rating Bureau, stated that the DFPD's current fire rating is Class Six. If the DFPD reduced its staff, Windham stated the rating would fall to Class Ten, the lowest rating available. Eaton, a State Farm insurance agent, stated "[i]n the event the Diamondhead community['s] fire rating were to decrease from a six to a ten, the homeowner insurance

3

premium on a $245,000 residence in the Diamondhead community would increase by approximately $4,409 per year."

¶6.     The trial court determined that the DFPD had authority to assess fees for "services rendered" and did not find any restrictive language regarding the term. The trial court stated "a fire department provides services in a variety of ways other than simply putting out a fire or filling a fire extinguisher, services for which plaintiffs maintain property owners could be charged." Accordingly, the trial court determined the DFPD's charge for fire-protection services was a fee, not a tax, and thus permissible.

¶7.     The property owners filed a motion to reconsider, which the trial court denied. Aggrieved, the property owners filed an appeal with this Court.

## DISCUSSION

¶8.     "This Court employs a *de novo* standard of review when reviewing questions of law, including motions for declaratory judgment." ***Tunica County v. Hampton Co. Nat'l Sur., LLC***, 27 So. 3d 1128, 1131 (Miss. 2009).

¶9.     The issue before this Court is whether the DFPD's fee for fire-protection services is based on services rendered or whether the charge amounts to an illegal tax.[1]

¶10.    Mississippi Code Section 19-5-151 provides for the incorporation of water, sewer, garbage and waste collection and disposal, and fire protection districts in unincorporated areas of the state. The Legislature has given such districts explicit authority to assess fees

---

[1]The property owners have presented two issues: (1) Whether the monthly fee is an illegal tax and (2) whether the power to tax must be narrowly construed. Because the issues are related, they will be discussed together.

4

for services rendered as a funding mechanism. *See* Miss. Code Ann. § 19-5-177 (1)(e) (Rev. 2012). However, the meaning of "services rendered" is an issue of first impression.

¶11. The property owners argue that they receive a service from the fire department only if the department responds to an emergency call and that the assessed fees are really for "anticipatory services." However, the DFPD asserts that many day-to-day actions are required for it to have the ability to put out fires. To conduct its fire-protection service, the DFPD is required to maintain and repair equipment; to have certified and experienced firefighters available on a daily basis; to provide nationally registered emergency medical technicians; to maintain pre-incident plans, to inspect fire hydrants, and to conduct public fire-and-life safety education training to and for the Diamondhead community. The property owners also have received the benefit of a better fire rating from the Mississippi Ratings Bureau, which resulted in significantly lower homeowner/fire insurance premiums. Finally, better fire protection enhances property values and makes the community more attractive to prospective home buyers/residents.

¶12. Words contained in statutes are to be interpreted "according to their common and ordinary acceptation and meaning." Miss. Code Ann. § 1-3-65 (Rev. 2005). Black's Law Dictionary defines "service" as "the act of doing something useful for a person or company for a fee; a person or company whose business is to do useful things for others; an intangible commodity in the form of human effort, such as labor, skill or advice; [or as a verb] to provide service for. . . . " *Black's Law Dictionary* 638 (2d pocket ed. 2001). Webster's Third New International Dictionary defines service as ". . . the performance of work commanded or paid for by another. . . : an act done for the benefit or at the command of

another. . . : action or use that furthers some end or purpose: conduct or performance that assists or benefits someone or something . . . : useful labor that does not produce a tangible commodity. . . ," or (as a verb) "to perform services for: meet the needs of . . . : to provide information or other assistance to. . . ." *Webster's Third New Int'l Dictionary* 2075 (2002).

¶13.    Courts in other jurisdictions have held that similar service fees are permissible.  The Supreme Court of Washington held that "benefit charges" levied by fire protection districts were not taxes or assessments, but rather fees for benefits received.  ***King County Fire Prot. Dist. v. Housing Auth. of King County***, 872 P. 2d 516, 524 (Wash. 1994).  In ***King County***, the fees at issue were "reasonably proportioned to the measurable benefits to property resulting from the services afforded by the district" and were assessed "based on *fire insurance rates*, distance to fire equipment, the level of services provided to the property, or the need of the property for specialized services," and, therefore, were distinguishable from property taxes.  ***Id.*** at 523 (emphasis added).  The Court of Appeals of Wisconsin has rejected the assertion that  a fee is appropriate only where a service actually is used to fight a fire — or that to be a fee, a charge must be assessed for commodities actually consumed.  ***City of River Falls v. St. Bridget's Catholic Church of River Falls***, 513 N.W. 2d 673, 675-76 (Wis. Ct. App. 1994).  That court held that "the substance, and not the form, of the imposition is the test" of a charge's "true character."  ***Id.*** (*citing **Milwaukee v. Milwaukee & Suburban Transp. Corp.***, 94 N.W. 2d 584, 588 (Wis. 1959)).  The court found that the primary purpose of the charge at issue was to cover the expense of making water available, storing the water and ensuring that water would be delivered as needed to fight fires at utility

6

customers' properties. *Id.* at 676. Therefore, the substance of the charge was consistent with a fee, not a tax. *Id.*

## CONCLUSION

¶14. We find that the DFPD provides a valuable service by having fire and other emergency services available to respond to an emergency. Therefore, the fee assessed is permissible. The trial court's judgment is affirmed.

¶15. **AFFIRMED**.

**RANDOLPH, P.J., LAMAR AND PIERCE, JJ., CONCUR. KING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS AND CHANDLER, JJ. DICKINSON, P.J., AND COLEMAN, J., NOT PARTICIPATING.**

**KING, JUSTICE, DISSENTING:**

¶16. I would find that Diamondhead Fire Protection District's (DFPD) fee is an illegal tax. Accordingly, I would reverse and render the trial court's judgment.

¶17. The Legislature has authorized the ad valorem tax as the primary funding source for fire-protection districts. Miss. Code Ann. § 19-5-189(2) (Rev. 2012). As a secondary funding source, it has authorized fire-protection districts to charge and collect fees for the services which they render. Miss. Code Ann. § 19-5-177(1)(e) (Rev. 2012).

### A. Funding Mechanisms

#### 1. Tax

¶18. The property owners argue that only the Legislature has the power to tax; a fire district has no such power. The property owners maintain that the Legislature has given municipalities limited authority to assess fees for services rendered.

7

¶19.    The power to tax rests with the Legislature.  *See* ***City of Jackson v. Pittman***, 484 So. 2d 998, 999 (Miss. 1986).  Through that power, the Legislature may confer upon political subdivisions the authority to levy taxes.  ***Id***.; *see* Miss. Code. Ann. § 21-33-45 (Rev. 2007) (giving municipalities authority to levy ad valorem taxes).  But Mississippi Constitution Article 4, Section 80 provides that:

> Provision shall be made by general laws to prevent the abuse by cities, towns, and other municipal corporations of their powers of assessment, taxation, borrowing money, and contracting debts.

Miss. Const. art. 4, § 80.  "Thus a municipality has no power concerning taxation beyond that authorized by the Legislature and entailed thereby."  ***Pittman***, 484 So. 2d at 999.

¶20.    Mississippi Code Section 19-5-189 gives a county board of supervisors authority to levy a special tax for fire-protection services.[2]    Miss. Code Ann. § 19-5-

---

[2]Section 19-5-189 provides, in part:

(1)(a) **Except as otherwise provided in subsection (2) of this section for levies for fire protection purposes** and subsection (3) of this section for certain districts providing water service, **the board of supervisors of the county** in which any such district exists may, according to the terms of the resolution, levy a special tax, not to exceed four (4) mills annually, on all of the taxable real property in such district, the avails of which shall be paid over to the board of commissioners of the district to be used either for the operation, support and maintenance of the district or for the retirement of any bonds issued by the district, or for both.

. . .

(2)(a) In respect to fire protection purposes, the board of supervisors of the county in which any such district exists on July 1, 1987, may levy a special tax annually, not to exceed the tax levied for such purposes for the 1987 fiscal year on all of the taxable real property in such district, the avails of which shall be paid over to the board of commissioners of the district to be used either for the operation, support and maintenance of the fire protection district

189 (Rev. 2012). The tax collected "shall be paid over to the board of commissioners of the district to be used either for the operation, support and maintenance of the fire protection district or for the retirement of any bonds issued by the district for fire protection purposes, or for both." *Id.* Where needed, the statute also provides a mechanism for the board of supervisors to increase the tax levy. *See* Miss. Code Ann. § 19-5-189(2)(c) (Rev. 2012).

¶21. The DFPD currently benefits from the county board of supervisors' authority to level a special tax for fire-protection services. It receives four mills of the ad valorem tax collected by the county.

### 2. Fees

---

or for the retirement of any bonds issued by the district for fire protection purposes, or for both. Any such district for which no taxes have been levied for the 1987 fiscal year may be treated as having been created after July 1, 1987, for the purposes of this subsection.

(b) In respect to fire protection purposes, the board of supervisors of the county in which any such district is created after July 1, 1987, may, according to the terms of the resolution of intent to incorporate the district, levy a special tax not to exceed two (2) mills annually on all of the taxable real property in such district, the avails of which shall be paid over to the board of commissioners of the district to be used either for the operation, support and maintenance of the fire protection district or for the retirement of any bonds issued by the district for fire protection purposes, or for both; however, if the district is created pursuant to a mandatory election called by the board of supervisors, in lieu of a petitioned election under Section 19-5-157, the board of supervisors may levy a special tax annually not to exceed an amount to be determined by the board of supervisors and stated in the notice of such election. The mandatory election authorized herein shall be conducted in accordance with paragraph (c) of this subsection. The special tax may be increased if such increase is authorized by the electorate pursuant to an election conducted in accordance with paragraph (c) of this subsection.

Miss. Code Ann. §19-5-189 (Rev. 2012) (emphasis added).

9

¶22. In addition to receiving the ad valorem tax revenue, the fire-protection district can charge a fee for its service. The Legislature has granted counties authority to create utility and fire-protection districts. Miss. Code Ann. § 19-5-151(1) (Rev. 2012). Those districts have "the power enumerated in the resolution of the board of supervisors" and are "limited to the conducting and operating of . . . a fire protection system." Miss. Code Ann. § 19-5-175 (Rev. 2012). To accomplish the purpose of creating a fire-protection district, the district:

> Shall be vested with all the powers necessary and requisite for the accomplishment of the purpose for which the district is created. No enumeration of powers herein shall be construed to impair or limit any general grant of power herein contained not to limit any such grant . . . . Such districts are empowered to do all acts necessary, proper, or convenient in the exercise of the powers granted under such sections.

*Id*. One power the district has is "to fix, maintain, collect and revise rates and charges for *services rendered* by or through the facilities of such district . . . ." Miss. Code Ann. § 19-5-177(1)(e) (Rev. 2012) (emphasis added).

### 3. Bonds

¶23. The Legislature also has allowed funding for fire-protection districts through bonds.[3] "Any such district shall have the power to provide funds for the purpose of constructing, acquiring, reconstructing, improving, bettering or extending the facilities of such district . . . by the issuance of revenue bonds." Miss. Code Ann. § 19-5-181 (Rev. 2012). The district's

---

[3]The property owners raised the issue of bonds below but have not focused on that argument in this appeal. The DPFD argues that a bond is not required to charge a fee for fire-protection services.

board of commissioners "may issue bonds of such district by resolution spread upon the minutes of such board." Miss. Code Ann. § 19-5-183(1) (Rev. 2012).

¶24.    Mississippi law allows revenue for a fire-protection district to be raised through taxes (levied by the county board of supervisors), fees for services rendered (charged by the fire-protection district), and bonds.  Likewise, Arizona has concluded that a fire-protection district may raise revenue only through taxes, fees (which can be charged only for a specific service actually rendered), and bonds. *Nw. Fire Dist. v. U.S. Home of Arizona Constr. Co.*, 215 Ariz. 492, 495 (¶13), 161 P.3d 535 (Ariz. 2007).

### B.  Fees for Services Rendered

¶25.    The property owners and the DFPD agree that fire-protection districts have the authority to charge fees for "services rendered."  Miss. Code Ann. § 19-5-177(e) (Rev. 2012).  However, the parties disagree on what encompasses "services rendered."  The property owners argue that the statutes should be construed narrowly.  I agree.  The Court has stated:

> [W]here a statute enumerates and specifies the subject or things upon which it is to operate, it is to be construed as excluding from its effect all those not expressly mentioned or under a general clause, those not of like kind or classification as those enumerated . . . .

*Lee v. Alexander*, 607 So. 2d 30, 36 (Miss. 1992).  The property owners claim that the district-wide fire-protection fee charged by the DFPD is for services that were not actually rendered but for "anticipatory services."  The property owners suggest that "services rendered" should be equivalent to using a toll road, stating that:

> The archetypal example is a toll road providing access to only those who use the road and are therefore willing to pay for it.  Unlike the road everybody uses

11

> through the middle of town, the whole community does not pay a tax to pave the road – only those who want to use it.

In other words, the property owners argue the DFPD should not charge them unless they receive a specific, direct service from the DFPD – have a fire extinguished, an inspection conducted, and so on.

¶26. The DFPD contends that the plain language of neither Section 19-5-175 nor Section 19-5-177 places a specific restriction on a district's ability to charge a fee. While the DFPD has not responded to an emergency call for every property owner, the DFPD states that it has rendered many other services to the property owners. These services include: (a) responding to more than 700 emergency calls, including fires; (b) maintaining and repairing equipment; (c) responding quickly to emergency calls; (d) providing four, experienced firefighters on duty at all times – including a captain and lieutenant; (e) having nationally registered emergency medical technicians; (f) conducting pre-incident plans, fire-hydrant inspections, and public fire-and-life safety training sessions; and (g) providing Class Six fire-protection services which benefit the Diamondhead community with lower insurance premiums. Thus, the DFPD claims it is entitled to charge a fee for these services.

¶27. "Services rendered" is not defined by statute, and no caselaw exists which interprets the phrase. When statutory terms are not defined, the Court applies those terms "according to their common and ordinary acceptation and meaning." Miss. Code Ann. § 1-3-65 (Rev. 2005). Render means "[t]o transmit or deliver." *Black's Law Dictionary* 1410 (9th ed. 2009). "Service" has several meanings. "Service," in its verb form, means "[t]o provide service for; specif[ically]" *Id*. at 1491. As a noun, "service" refers to "[t]he act of doing

12

something useful for a person or company. . . for a fee," and "service" also is defined as "[a]n intangible commodity in the form of human effort, such as labor, skill, or advice." *Id.*

¶28.    Several Attorney General (AG) opinions have addressed whether a fire-protection district may charge a fee for its services.  AG opinions are not binding on this Court but may be viewed as persuasive authority. ***Poppenheimer v. Estate of Coyle***, 98 So. 3d 1059, 1066 (¶22) (Miss. 2012).

¶29.    In 1990, the Board of Commissioners for the DFPD asked the AG whether it could charge a fee for fire-protection services. *Sylvia Pross*, Op. Att'y Gen., 1990 WL 548177, *1 (November 29, 1990).  The letter read, in part:

> Our tax millage revenues are decreasing as more property owners become eligible for the 65 or over exemption instead of increasing as more houses are built.  Yet additional burdens for men and equipment are placed on the District for fire-protection service.
>
> . . .
>
> State Statute 19-5-177, Additional powers of districts, states in part 'acting by and through the board of commissioners of such district as its governing authority, shall have the following among other powers:
>
>> (e) to fix, maintain, collect and revise rates and charges for services rendered by or through the facilities of such districts' etc.
>
> We respectfully solicit your opinion of acceptable methods of increasing revenues in accordance with the State Statutes.  For example, is it permissible for a fire district to charge for services?[4]

---

[4]In it is letter to the AG, the DFPD stated clearly its need to increase revenue for fire-protection services because "our tax millage revenues are decreasing as more property owners become eligible for the 65 or over exemption." *Pross*, 1990 WL 54877, *1.  It is important to note that the Legislature created a special homestead exemption for persons over sixty-five years of age.  It is illogical to believe the Legislature created a special

13

*Id.* The AG opined that the powers listed in Section 19-5-177(e) allow fire-protection

districts "to so fix rates or charges for services rendered." *Id.*

¶30.    In 2000, a Benton County supervisor asked the AG the following: "Benton County

owns a fire department building and land located in one of its towns. Can this [volunteer]

fire department charge dues to its residents who are already paying fire protection millage

as part of their land taxes?" *Randy Wilburn*, Op. Att'y Gen., 2000 WL 1207464 (July 14,

2000). In response, the AG cited the home rule statute, which provides:

> (1) **The board of supervisors of any county** shall have the power to adopt
> any orders, resolutions or ordinances with respect to county affairs, property
> and finances, for which no specific provision has been made by general law
> and which are not inconsistent with the Mississippi Constitution, the
> Mississippi Code of 1972, or any other statute or law of the State of
> Mississippi . . . .
>
> . . .
>
> (3) This section shall not authorize the board of supervisors of a county to (a)
> levy taxes other than those authorized by statute or increase the levy of any
> authorized tax beyond statutorily established limits.

*Id.* (citing Miss. Code Ann. § 19-3-40) (emphasis added). Accordingly, the AG opined that

the current millage rate could be increased if it were less than the statutory maximum. *Id.*

In addition, the AG stated, "we are of the opinion that charging 'dues' for fire protection

constitutes a tax that is not authorized by statute and is therefore prohibited." *Id.*

¶31.    In 2001, the North Tunica Fire Protection District asked whether it could charge for

responding to emergency calls, specifically automobile accidents. *Andrew Dulaney*, Op.

homestead exemption for persons over sixty-five years old and then allowed the DFPD to
circumvent the Legislature's intent by taxing all property owners for fire protection under
the guise of a fire-protection fee.

14

Att'y Gen., 2001 WL 1082630 (August 24, 2001). The AG opined that fire-protection services included emergency response and rescue services. *Id*. Citing Section 19-5-177, the AG opined that the fire-protection district "may set and collect rates and/or charges for the provision of emergency response services, or rescue services." *Id*.

¶32. The North Forrest Fire Protection District initially had a voluntary fee and assessed property owners 1 mill for fire-protection services. *Charles Marshall*, Op. Att'y Gen., 2005 WL 3817032 (December 27, 2005). But in 2005, the district adopted and began enforcing a mandatory fee. *Id*. A district supervisor asked the AG whether the mandatory fee was legal. *Id*. Again, citing Section 19-5-177(e) and previous AG opinions, the AG opined that:

> It is still the opinion of this office that the fire district may on a case by case basis fix rates and charges for services which have already been rendered. However, this does not authorize the fire district to levy rates and charges in anticipation of rendering services. To do so would amount to the levying of an unlawful tax.

*Id*.

¶33. I note the following points from the AG opinions: (1) The AG states that, generally, fire-protection districts are supported by millage collected from ad valorem taxes. If the millage assessed is insufficient, the county may increase the millage rate to the statutory maximum; (2) under Section 19-5-177(1)(e), the AG opines that a fire-protection district can charge fees for services rendered; (3) the AG opines the district may not levy and collect a fee "in anticipation of services rendered" because this would amount to an unlawful tax; (4) property owners may pay fire-protection fees voluntarily, but mandatory fire-protection fees charged "in anticipation of services rendered" amount to an unauthorized tax.

15

¶34.   In this case, the DFPD already receives four (4) mills collected from ad valorem taxes. It once received donations from two groups. When those groups no longer donated to the DFPD, the DFPD charged property owners a mandatory, flat fee for fire-protection services to supplement its share of ad valorem taxes.[5] The fee is charged regardless of whether the property owners receive a direct service from the DFPD, for instance, an emergency-call response.[6]

¶35.   When construed narrowly, the property owners maintain that "'[s]ervices rendered' assumes a particular, unique and specific service to a particular and specific person. It cannot be distorted to encompass all services possibly rendered – for this would have the characteristic of a tax."[7]

¶36.   While it is true that AG opinions are not binding on this Court, in this case, I find the AG opinions to be persuasive. Based on the definitions of "service" and "render," I would find that "services rendered" are those specific services delivered directly to a specific

---

[5]The Washington Supreme Court held that a flat, monthly rate for ambulance service imposed on every household and business within the area was neither a valid tax nor a valid fee for services rendered. *Arborwood Idaho, L.L.C. v. City of Kennewick*, 89 P.3d 217 (Wash. 2004). However, in 1994, the court held that a "benefit charge" upon a housing authority for fire-protection services was a permissible fee, not a tax. *King County Fire Prot. Dist. v. Housing Auth. of King County*, 872 P.2d 516 (Wash. 1994). Washington has a "benefit charge" statute. *Id.* at 522.

[6]In contrast, the Missouri Court of Appeals affirmed a judgment against a couple for services rendered by a local fire district. *Brandsville Fire Prot. Dist. v. Phillips*, 374 S.W.3d 373 (Mo. Ct. App. 2012). The fire district had charged the couple "$100 for an 'initial call out' fee plus $562.50 for 2.25 hours at $250 per hour for time spent at the scene" of a single-car accident. *Id.* at 375.

[7]The property owners also note that House Bill 356, which would have revised Section 19-5-177 to allow fire districts to collect fees from property owners, had died in committee. *See* H.B. 356, Reg. Sess. (Miss. 2008).

customer. Thus, the fire-protection district can fix various rates for its services (fire response, emergency response, inspections, and so on) and charge a fee to the specific customer who receives those specific services. However, things such as (a) having four experienced firefighters on duty at all times, (b) maintaining and repairing equipment, (c) having nationally registered emergency medical technicians, (d) conducting pre-incident plans, fire-hydrant inspections, and public and life safety training sessions, and (e) providing Class Six fire-protection services are anticipatory services, which are anticipated to be funded through the ad valorem tax levy.

### C. Fee Versus Tax

¶37. Though not directly on point, the parties cite cases regarding impact fees to support their positions. The Court previously has explored this issue in *Mayor and Board of Alderman of Ocean Springs v. Homebuilders Association of Mississippi, Inc.*, 932 So. 2d 44 (Miss. 2006). Most importantly, *Ocean Springs* details the difference between a fee and a tax.

¶38. In *Ocean Springs*, the city adopted an impact-fee ordinance that authorized assessment of various impact fees for public improvements and services, which included a fire-facilities-development fee.[8] *Ocean Springs*, 932 So. 2d at 47(¶1). The city planned to assess fees against new developments, which would impact the said service, and use the fees to improve and expand the designated services. *Id*. The homebuilders association filed a bill

_____

[8]Other impact-fee ordinances at issue charged fees for the development of municipal facilities, park and recreational facilities, police facilities, major roadways, and water facilities. *Ocean Springs*, 932 So. 2d at 48 (¶8).

17

of exceptions, arguing that the impact fees amounted to an illegal tax. *Id*. at 47 (¶3). The circuit court agreed and held the impact fees were an unlawful taxing measure. *Id*. at 48 (¶4).

¶39. The Court noted the power to tax is granted solely to the Legislature, and the Legislature may grant a municipality authority to impose exactions. *Id*. at 52 (¶¶21-22). Citing the Mississippi Constitution, the Court cautioned that "provision shall be made by general laws to prevent the abuse of cities, towns, and other municipal computations of their powers of assessment, taxation, borrowing money, and contracting debts." *Id*. at 52 (¶22) (quoting Miss. Const. art 4, § 80). Accordingly, the Court noted that the Legislature had not adopted any impact-fee statutes or other legislation which would authorize a city to establish an impact fee. *Id*. at 51, 53 (¶¶17, 27, 31).

¶40. Next, the Court explored whether the impact fee was a valid exercise of the city's police power or an invalid tax. *Id*. at 53-58 (¶¶32-60). In essence, the Court held that the general levy of taxes is a mandatory payment, it provides revenue to the government, it is exacted for public purposes, and it provides a benefit to the community as a whole. *Id*. at 54 (¶¶32-34). On the other hand, the Court determined that a fee is charged by an agency to defray its cost of operation, and it confers a special benefit/service upon the payer. *Id*. at 54-55 (¶¶32-40). The Court found that the impact fees were "a revenue-raising measure" for public services which traditionally were funded by taxes, were not related to expenses, and did not confer a special benefit upon the payer. *Id*. at 55, 60 (¶¶40, 44, 71). The Court cautioned:

> A municipality could classify any exaction as a "fee" for the provision of services or facilities and evade the Constitutional and Legislative limitations placed upon governing authorities in regard to taxation.

18

*Id*. at 56 (¶44). Thus, the Court held the impact fees constituted a tax. *Id*. at 60 (¶¶70-71).

¶41. In regard to impact fees, the Court reached the same conclusion in *Sweet Home Water and Sewer Association v. Lexington Estates, Ltd.*, 613 So. 2d 864 (Miss. 1993). In *Sweet Home*, a public water and sewer utility attempted to charge an apartment-complex owner fees for water services and an impact fee, per unit installed, for any negative effects on its water system. *Sweet Home*, 613 So. 2d at 866. Although it had authority to charge fees for services rendered, the Court held that Sweet Home could not charge an impact fee based on fear the apartment complex would negatively impact its system. *Id*. at 870.

¶42. Twenty dollars seems like a small price to pay for two fully-staffed fire departments, experienced firefighters, state-of-the-art equipment, and lower home-insurance premiums. Those who agree probably would pay the fee voluntarily,[9] but the fee cannot be mandatory. I would find that the fire-protection fee possesses the basic characteristics of a tax. The fee is a mandatory charge, and it is imposed on all property owners within the district, regardless of whether or not the property owners receive a specific, direct service from the DFPD. The fee generates revenue to support the DFPD. Clearly, having a fully staffed and experienced fire department with the best equipment benefits the community as a whole, but that benefit is to be funded by the ad valorem tax. Thus, the DFPD's fee is an impermissible tax.[10]

---

[9]Nationally, many fire districts have voluntary fire-protection dues and bill nonsubscribers for any fire-protection services they receive.

[10]In Florida, the district court of appeals found that a fire-line charge, which was imposed on properties exceeding a certain size, was a patently discriminatory tax. *City of Miami Beach v. Jacobs*, 315 So. 2d 227 (Fla. Dist. Ct. App. 1975).

¶43. The majority suggests that the fee is permissible because the property owners receive a benefit from the DPFD's preparation to render services, "a better fire rating," and because "fire protection enhances property values and makes the community more attractive to prospective home buyers/residents." Maj. Op. ¶11. In support of its position, the majority cites two cases: ***King County Fire Protection District v. Housing Authority of King County,*** 872 P. 2d 516 (Wash. 1994), and ***City of River Falls v. St. Bridget's Catholic Church of River Falls***, 513 N.W. 2d 673 (Wis. Ct. App. 1994). Maj. Op. ¶13.

¶44. As previously mentioned in footnote five of this opinion, ***King County*** is inapplicable. In ***King County***, the court determined that a housing authority was required to pay a "benefit charge" to the local fire-protection district. Unlike Mississippi, the state of Washington has a benefit-charge statute which specifically allows fire-protection districts to assess a charge based on the benefit property owners receive from their services, not services actually rendered. The statute provides:

> The board of fire commissioners of a fire protection district may by resolution, for fire protection district purposes authorized by law, **fix and impose a benefit charge** on personal property and improvements to real property which are located within the fire protection district on the date specified and which have or will receive the benefits provided by the fire protection district, to be paid by the owners of the properties . . . .

Wash. Rev. Code Ann. § 52.18.010 (emphasis added). The benefit-charge statute provides further that "[t]he aggregate amount of such benefit charges in any one year shall not exceed an amount equal to sixty percent of the operating budget for the year in which the benefit charge is to be collected . . . ." ***Id***. The DFPD's collected fees account for seventy-four

percent of its budget. Nevertheless, because Mississippi does not have a similar benefit-charge statute, *King County* is inapplicable.

¶45. To support its belief that fees can be charged regardless of services rendered, the majority also relies on *River Falls*. Maj. Op. ¶13. *River Falls* held that the city could charge its water customers, including churches, for *storing and providing water* for fire protection. *River Falls*, 513 N.W. 2d at 676. *River Falls* has nothing to do with fire-protection fees. Wisconsin's statute specifically provides that a town may "charge property owners a fee for the cost of fire protection provided to their property . . . according to a written schedule established by the town board." Wis. Stat. § 60.55(2)(b). The Wisconsin Court of Appeals has addressed whether a town may charge a county fire-protection fees based on (1) a valuation of county properties within the town, or (2) on or a per-call basis. *Town of Janesville v. Rock County*, 451 N.W.2d 436 (Wis. Ct. App. 1989). The court determined that "[Section] 60.55(2)(b) allows the town to charge the county for fire protection on a per call basis." *Id*. at 436. In distinguishing fees like the ones imposed in *River Falls* from fire-protection fees, the Wisconsin Court of Appeals held that:

> We have approved levying charges on a district basis, even when a property is not specially benefitted by the service. *Grace Episcopal Church v. City of Madison*, 129 Wis. 2d 331, 336-37, 385 N.W.2d 200, 203 (Ct. App.1986). Also, we have allowed special charges under sec. 66.60(16)(a) when other property owners pay their share of the costs of the service in a different manner. *Rubin v. City of Wauwatosa*, 116 Wis. 2d 305, 316, 342 N.W.2d 451, 456 (Ct. App. 1983). However, we distinguish the case before us, not on the basis of the type of service or the payment scheme, but because **the statute allows a special charge only for services which are actually performed.**

21

***Town of Janesville***, 451 N.W.2d. at 439 (emphasis added). Accordingly, the court remanded the case "to the trial court for a determination of the amount the county owes the town, **based on a reasonable per call calculation**." ***Id***. at 440 (emphasis added).

¶46.   Fire-protection districts were created to provide areas, not located within corporate boundaries, *adequate* fire-protection services. *See* Miss. Code Ann. § 19-5-151 (Rev. 2012). By charging fees to all property owners without rendering a specific service to each, the DFPD was able to accumulate funds, which represents seventy-four percent of its budget, to build a top-class fire department, rivaling municipal-level services. While beneficial and impressive, this simply is not the purpose of Section 19-5-177(1)(e). "A municipality could classify any exaction as a 'fee' for the provision of services or facilities and evade the Constitutional and Legislative limitations placed upon governing authorities in regard to taxation." ***Ocean Springs***, 932 So. 2d at 56 (¶44). The Legislature has provided fire-protection districts with several ways to receive funding to support their growth – by tax revenue received from the county board of supervisors, through the issuance of bonds, and through fees charged for ***specific* services rendered**. Why would the Legislature specify that fire-protection districts could charge fees for "services rendered" if fire-protection districts could charge fees simply for existing?

## CONCLUSION

¶47.   Municipalities have limited taxing power, which can be used to fund fire-protection districts. However, fire-protection districts may charge fees only for "services rendered." "Services rendered" are those specific services delivered directly to a specific customer. The DFPD's fee is a mandatory payment charged to all property owners in the district. It is not

22

a result of a specific service provided to the payer, and it benefits the community as a whole. A fire-protection district may not charge a fee in anticipation of rendering a service; this is an impermissible tax. Accordingly, I would reverse and render the trial court's declaratory judgment.

**KITCHENS AND CHANDLER, JJ., JOIN THIS OPINION**.